Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
02/09/2018 08:14 AM CST

- 705 -

Nebraska Supreme Court Advance Sheets
298 Nebraska Reports
HAND CUT STEAKS ACQUISITIONS v. LONE STAR STEAKHOUSE
Cite as 298 Neb. 705

Hand Cut Steaks Acquisitions, Inc., an Arkansas
corporation, appellant and cross-appellee,
v. Lone Star Steakhouse & Saloon of
Nebraska, Inc., a Nebraska corporation,
appellee and cross-appellant, and
LSF5 Cactus, L.L.C., a Delaware
limited liability company, appellee.

___ N.W.2d ___

Filed January 19, 2018.    No. S-16-1005.

1. **Evidence: Stipulations: Appeal and Error.** In a case in which the facts
   are stipulated, an appellate court reviews the case as if trying it origi-
   nally in order to determine whether the facts warranted the judgment.
2. **Judgments: Jurisdiction: Appeal and Error.** When a jurisdictional
   question does not involve a factual dispute, determination of a jurisdic-
   tional issue is a matter of law which requires an appellate court to reach
   a conclusion independent from the trial court's.
3. **Landlord and Tenant: Abandonment.** An abandonment of leased
   premises by the tenant constitutes an offer to terminate the lease.
4. **Landlord and Tenant: Abandonment: Intent.** Whether there has been
   an acceptance by the landlord of the tenant's abandonment of the prem-
   ises is largely a matter of intention, and such an acceptance may be
   inferred from acts of the landlord inconsistent with the continuance of
   the lease.
5. **Landlord and Tenant.** Whether a surrender and acceptance of leased
   premises occurred is a question of fact.
6. **Landlord and Tenant: Abandonment: Damages.** After a tenant aban-
   dons leased property, a landlord may mitigate its damages not only by
   reletting the property to another tenant, but also by selling the property.
7. **Landlord and Tenant: Abandonment: Intent.** Like retaking and relet-
   ting leased property, the act of attempting to sell and selling the property
   by a landlord after a tenant abandons it is equivocal and can evince an

- 706 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
298 NEBRASKA REPORTS
HAND CUT STEAKS ACQUISITIONS v. LONE STAR STEAKHOUSE
Cite as 298 Neb. 705

intent to mitigate the landlord's damages just as easily as it can evince an intent to accept the tenant's surrender.

8. **Landlord and Tenant: Abandonment: Damages: Intent: Presumptions.** Where a landlord's actions are not inconsistent with an intent to mitigate its damages, a court will not presume that the landlord intended to accept the tenant's surrender of the leased premises and terminate the lease.

9. **Landlord and Tenant: Abandonment: Damages.** A landlord may not unreasonably refuse to accept a qualified and suitable substitute tenant for the purpose of mitigating the damages recoverable from a tenant who has abandoned the leased premises prior to the expiration of the term.

10. ____: ____: ____. A landlord has a duty to relet the premises in order to mitigate damages when a tenant abandons the premises prior to the expiration of a lease. This duty to mitigate requires that the landlord take all reasonable steps to reduce his damages.

11. **Landlord and Tenant: Abandonment: Damages: Proof.** In a landlord's action to recover unpaid rent upon a tenant's abandonment of the premises prior to the end of the lease term, the tenant has the burden to show that the landlord unreasonably failed to relet the premises and mitigate damages.

12. **Landlord and Tenant: Abandonment: Damages.** After a tenant has abandoned leased premises, a landlord may satisfy its duty to mitigate damages by retaking the premises and making reasonable efforts to relet the premises on the tenant's account, to sell the property, or both.

13. **Landlord and Tenant: Leases: Breach of Contract: Damages: Sales: Time.** A landlord may generally recover unpaid rent and expenses due under a lease from the time of the tenant's breach through the time a sale of the property is completed, plus any commercially reasonable expenses incurred in order to procure a new tenant or buyer.

14. **Landlord and Tenant: Abandonment: Damages.** A landlord's efforts to mitigate its damages after a tenant abandons the leased property must be commercially reasonable under the circumstances.

15. **Landlord and Tenant: Abandonment: Damages: Time.** A landlord's duty to mitigate its damages arises when the tenant abandons or surrenders the property.

16. **Landlord and Tenant: Abandonment: Damages.** Until there is an abandonment or tender of property by a tenant, a landlord has no duty to mitigate its damages by reletting or selling the property.

17. **Landlord and Tenant: Abandonment: Damages: Sales: Time.** If a landlord's efforts to mitigate its damages by selling abandoned property are reasonable under all the circumstances—including reasonable in time—damages will ordinarily run until the date of sale.

- 707 -

Nebraska Supreme Court Advance Sheets
298 Nebraska Reports
HAND CUT STEAKS ACQUISITIONS v. LONE STAR STEAKHOUSE
Cite as 298 Neb. 705

18. **Jurisdiction: Words and Phrases.** Personal jurisdiction is the power of a tribunal to subject and bind a particular person or entity to its decisions.

19. **Constitutional Law: Jurisdiction: Due Process: Service of Process: States.** Courts' ability to validly exercise personal jurisdiction is not without limit. The Due Process Clause of the 14th Amendment to the U.S. Constitution bars a court from exercising personal jurisdiction over an out-of-state defendant, served with process outside the state, unless that defendant has sufficient ties to the forum state.

20. **Constitutional Law: Jurisdiction: Statutes: Due Process: States.** A two-step analysis is used to determine whether a Nebraska court may validly exercise personal jurisdiction over an out-of-state defendant. First, a court must consider whether Nebraska's long-arm statute—Neb. Rev. Stat. § 25-536 (Reissue 2016)—authorizes the exercise of personal jurisdiction over the defendant. Second, a court must consider whether the exercise of personal jurisdiction over the defendant comports with the Due Process Clause.

21. **Constitutional Law: Jurisdiction: Statutes: Due Process.** If a Nebraska court's exercise of personal jurisdiction would comport with the Due Process Clause of the 14th Amendment, it is authorized by the long-arm statute—Neb. Rev. Stat. § 25-536(2) (Reissue 2016).

22. **Constitutional Law: Jurisdiction: Due Process: States: Words and Phrases.** To satisfy the Due Process Clause, a court may only exercise personal jurisdiction over a defendant that is not present in the forum state if that defendant has "minimum contacts" with the forum such that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice. To constitute sufficient minimum contacts with the forum, a defendant's conduct and connection with the forum state must be such that he or she should reasonably anticipate being haled into court there.

23. **Jurisdiction: States.** Whether a defendant's contacts with the forum state are sufficient to support the exercise of personal jurisdiction will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.

24. ____: ____. Personal jurisdiction is proper where the defendant's contacts proximately result from actions by the defendant himself or herself that create a substantial connection with the forum state.

25. ____: ____. In the minimum contacts analysis, courts will consider the burden on a defendant in light of considerations such as (1) the forum state's interest in adjudicating the dispute, (2) the plaintiff's interest

- 708 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
298 NEBRASKA REPORTS
HAND CUT STEAKS ACQUISITIONS v. LONE STAR STEAKHOUSE
Cite as 298 Neb. 705

in obtaining convenient and effective relief, (3) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (4) the shared interest of the several states in furthering fundamental substantive social policies. Consideration of these factors may sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required.

26. ____: ____. The nature and quality of a defendant's contacts with the forum state necessary to support the exercise of personal jurisdiction depend on the connection between the contacts and the claim being asserted.

27. **Jurisdiction: States: Words and Phrases.** General, or all-purpose, jurisdiction is jurisdiction arising where a defendant's affiliations with a state are so continuous and systematic as to render the defendant essentially at home in the forum state.

28. **Jurisdiction.** Where a court has general personal jurisdiction over a defendant, it can adjudicate any claim against the defendant—even a claim that arises outside the forum state and bears no connection to the defendant's contacts with the forum.

29. **Jurisdiction: Words and Phrases.** Specific, or case-linked, jurisdiction requires that a claim arise out of or relate to the defendant's contacts with the forum.

30. **Jurisdiction.** A defendant need not be at home in the forum to be subject to specific personal jurisdiction, but, rather, there must be an affiliation between the forum and the underlying controversy.

31. **Jurisdiction: Words and Phrases.** Specific personal jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction. There must be a substantial connection between the defendant's contacts and the operative facts of the litigation.

32. **Jurisdiction: Due Process: Contracts.** For purposes of personal jurisdiction, it is sufficient for purposes of due process that a suit be based on a contract which has substantial connection with that state.

33. **Jurisdiction: States.** Personal jurisdiction may not be avoided merely because a defendant did not physically enter the forum state.

34. **Jurisdiction: States: Contracts.** To determine whether a defendant's contract supplies the contacts necessary for personal jurisdiction in a forum state, a court is to consider the parties' prior negotiations and future contemplated consequences, along with the terms of the contract and the parties' actual course of dealing.

35. **States: Real Estate.** Generally, a state has a unique interest in adjudicating transactions affecting its land.

- 709 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
298 NEBRASKA REPORTS
HAND CUT STEAKS ACQUISITIONS v. LONE STAR STEAKHOUSE
Cite as 298 Neb. 705

36. **Landlord and Tenant: Guaranty: States.** While a guaranty of a personal debt generally bears no intrinsic connection to any particular location, a guaranty to pay and perform a tenant's obligations under a lease of real property uniquely affects the state in which the premises are located.

37. **Jurisdiction: Due Process: States: Real Estate.** While the Due Process Clause's personal jurisdiction analysis no longer bears a rigidly territorial focus, states nevertheless, as coequal sovereigns in a federal system, have a special interest in adjudicating disputes relating to the real property with their borders.

38. **Jurisdiction: Guaranty: States.** Where a guarantor takes on obligations that are uniquely tied to and uniquely affect a particular location, it is not unreasonable for courts of that state to exercise personal jurisdiction over the guarantor in connection with claims arising from or related to those obligations.

39. **Jurisdiction: States: Contracts.** While the minimum contacts personal jurisdiction analysis is distinct from a choice-of-law analysis, a choice-of-law contractual provision in favor of the forum state's law is a relevant contact with the forum.

40. **Contracts: Attorney Fees: Public Policy.** In the absence of a uniform course of procedure or authorization by statute, contractual agreements for attorney fees are against public policy and will not be judicially enforced.

Appeal from the District Court for Douglas County: LEIGH ANN RETELSDORF, Judge. Affirmed in part, and in part reversed and remanded for further proceedings.

David L. Welch and Jeffrey A. Nix, of Pansing, Hogan, Ernst & Bachman, L.L.P., for appellant.

Michael S. Degan, of Kutak Rock, L.L.P., for appellees.

HEAVICAN, C.J., CASSEL, STACY, KELCH, and FUNKE, JJ.

CASSEL, J.

## I. INTRODUCTION

When a tenant abandons leased property, a landlord may either accept the abandonment, thereby terminating the lease, or attempt to relet or sell the property. Here, after the tenant stopped paying rent and the landlord sued, the tenant

- 710 -

Nebraska Supreme Court Advance Sheets
298 Nebraska Reports
HAND CUT STEAKS ACQUISITIONS v. LONE STAR STEAKHOUSE
Cite as 298 Neb. 705

surrendered the property. The landlord rejected offers by prospective tenants and instead, after lengthy negotiations, sold the property.

Following a bench trial on stipulated facts, the district court awarded damages to the date the landlord reached a tentative agreement to sell rather than to an actual sale date. And the court dismissed the tenant's out-of-state guarantor for lack of jurisdiction.

On appeal, we affirm the district court's damages award because, although the landlord did not terminate the lease, the duration of finalizing the sale was not reasonable. But because the guaranty established sufficient connections to Nebraska, we reverse the dismissal of the guarantor.

## II. BACKGROUND

### 1. Parties

The tenant, Lone Star Steakhouse & Saloon of Nebraska, Inc. (Lone Star), is a Nebraska corporation. Lone Star leased property in west Omaha, Nebraska, to use for the operation of a steakhouse restaurant from the landlord, Hand Cut Steaks Acquisitions, Inc. (HCS), an Arkansas corporation. LSF5 Cactus L.L.C. (Cactus), a Delaware limited liability company doing business in Texas, is a subsidiary of Lone Star's parent company. Cactus guaranteed the performance of Lone Star's obligations under the lease.

### 2. Property and Lease
### to Lone Star

In 2010, HCS hired an agent to list and market the property. He did so, eventually securing Lone Star as a tenant. Lone Star leased the property for a 66-month term, to run from 2010 through 2016. The lease began with 6 months of free rent, followed by rent increasing incrementally. Lone Star was also responsible for paying property taxes, property insurance, and common area maintenance costs.

The lease contained an attorney fee provision: "In the event of litigation between the parties to enforce this Lease, the

- 711 -

Nebraska Supreme Court Advance Sheets
298 Nebraska Reports
HAND CUT STEAKS ACQUISITIONS v. LONE STAR STEAKHOUSE
Cite as 298 Neb. 705

prevailing party in any such action shall be entitled to recover reasonable costs and expenses of suit, including, without limitation, court costs, attorneys' fees, and discovery costs."

The lease also contained a choice-of-law provision: "This Lease shall be construed, interpreted, and enforced pursuant to the applicable laws of the state in which the Premises are located."

Cactus executed a guaranty of the lease which provided that

[Cactus], in consideration of the direct and material benefits that will accrue to [it], and for the purpose of inducing [HCS] to enter into [the lease] with Lone Star . . . , a subsidiary of [Cactus], absolutely and unconditionally guarantees the payment and performance of, and agrees to pay and perform as primary obligor, all liabilities, obligations, and duties (including but not limited to payment of rent) imposed upon [Lone Star] under the terms of the . . . Lease.

And the lease acknowledged the guaranty signed by Cactus: "As an inducement to [HCS] to enter into this Lease, [Lone Star] agrees and acknowledges that its obligations under this Lease shall be guaranteed . . . by its parent corporation, [Cactus], a Delaware limited liability company . . . ." Cactus was also an insured under a general liability and workers' compensation and employers' liability insurance policy covering Lone Star's restaurant in Omaha.

### 3. Restaurant Closes and HCS Sues

In October 2012, Lone Star notified HCS that it planned to shut down its restaurant in 3 weeks. Lone Star continued paying rent through February 2013, but then stopped. In March 2013, HCS served a notice of default on Lone Star. In April, HCS filed suit against Lone Star and Cactus. Later in April, HCS demanded that Lone Star surrender the premises. Its demand letter stated, "This Notice shall in no way be construed as a termination of [the] Lease or as a relinquishment

- 712 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
298 NEBRASKA REPORTS
HAND CUT STEAKS ACQUISITIONS v. LONE STAR STEAKHOUSE
Cite as 298 Neb. 705

or waiver by [HCS] as to any rental amounts or other amounts due under [the] Lease . . . ." Lone Star surrendered the premises in early May, and the parties executed an acknowledgment of tender and receipt of premises agreement.

### 4. INTEREST FROM PROSPECTIVE TENANTS

Shortly after Lone Star notified HCS that it planned to close the restaurant, HCS began receiving inquiries about the availability of the property.

According to the parties' trial stipulation, "[HCS] relied upon [the agent] to relay communications for purposes of selling or reletting the Premises." But the parties also stipulated that HCS did not hire the agent or anyone else as a broker for the purpose of reletting the premises, before or after HCS regained control of the premises in May 2013. The agent did not do any marketing or list the property for HCS as was done in 2010, when he secured Lone Star's tenancy.

From October 2012 through February 2013, the agent and HCS' owner, Pat Boyd, corresponded with a broker representing a pizza firm about leasing or purchasing the property. The broker told HCS that the pizza firm "[w]ants the [p]roperty" and made multiple offers for a sale or lease. Boyd said in his deposition that he was not interested in the pizza firm because he did not find any of its offers acceptable and because he "was not interested in their concept." Boyd also said that he made up his mind that he was not interested in the pizza firm as a tenant as early as November 2012.

HCS also received two offers in May 2013 from a broker on behalf of a restaurant proprietor interested in starting a crab restaurant. Regarding the crab restaurant, Boyd testified, "This particular concept, we — we weren't interested in putting in our building." Boyd also said that he was not interested because he learned that the proprietor previously had several other restaurant concepts that failed.

- 713 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
298 NEBRASKA REPORTS
HAND CUT STEAKS ACQUISITIONS v. LONE STAR STEAKHOUSE
Cite as 298 Neb. 705

## 5. NEGOTIATIONS WITH
### ULTIMATE BUYER

Discussions with the ultimate buyer began in December 2012. In January 2013, the buyer sent HCS an offer to purchase the property. HCS rejected the offer and expressed its interest in negotiating a lease rather than a sale. They continued to negotiate, and in May, the buyer made another offer to purchase the property. Boyd told the buyer he was more interested in a lease than a sale of the property. The buyer told Boyd, "'We are too far apart to make a ground lease work here[, but w]e can be much more aggressive . . .'" in negotiating a purchase. The buyer asked HCS to make a counteroffer for the sale of the property. After further negotiations, a letter of intent (LOI) outlining the terms of the sale of the property for $1.715 million was executed in June 2013. However, it took until September 2013 for the parties to finalize the purchase agreement for the property and, due to some issues with title insurance, until April 2014 to close on the sale.

### 6. PRETRIAL MOTIONS AND ORDERS

Before trial, the district court granted a motion of Cactus, the guarantor of Lone Star's lease, to dismiss it for lack of personal jurisdiction. But the court later granted HCS' motion to reconsider its order and allowed limited discovery with regard to Cactus' contacts with Nebraska. After discovery was conducted, the court denied Cactus' renewed motion to dismiss and reserved ruling on the issue until trial. The district court also granted in part and denied in part HCS' pretrial motion for summary judgment, granting summary judgment on the issue of Lone Star's breach of the lease.

A bench trial was held on stipulated facts on the issue of damages, after which the district court issued a "Bench Trial Order." The court concluded that HCS had not accepted Lone Star's surrender of the lease, because HCS' "actions were consistent with a landlord attempting to mitigate its damages." The court also concluded that "[HCS] took reasonable

- 714 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
298 NEBRASKA REPORTS
HAND CUT STEAKS ACQUISITIONS v. LONE STAR STEAKHOUSE
Cite as 298 Neb. 705

steps to mitigate its damages after Lone Star's breach of the Lease."

The district court also addressed the issue of whether a landlord may mitigate its damages by selling, rather than reletting, the property:

> The Court does not find it reasonable to fault Lone Star for the lengthy closing process in the negotiations between [HCS] and [the buyer]. Under the theory of contracts, the breaching party is not to be punished for [its] breach, but rather, the non-breaching party is to be made whole. It would indeed be a punishment for Lone Star to pay nearly a year's worth of damages because the closing period between [HCS] and [the buyer] was such a drawn-out negotiation. Therefore, for purposes of mitigation and damages, the Court finds that the accrual of damages ended when [HCS] signed its [LOI] to sell the Premises to [the buyer] on June 13, 2013.

The district court awarded money damages against Lone Star in the amount of $49,415.27.

The district court also concluded that it lacked personal jurisdiction over Cactus and dismissed HCS' claims against it. The district court's order reserved the issue of attorney fees for a later hearing. After the order, HCS moved for attorney fees, based on the provision in the lease that attorney fees be awarded to the prevailing party in the event of litigation over the lease, and moved for a new trial. Lone Star also moved for a new trial. The district court overruled HCS' motions and overruled Lone Star's motion as untimely. HCS filed a timely appeal, and Lone Star asserted a cross-appeal.

## III. ASSIGNMENTS OF ERROR

HCS claims that the district court erred by (1) "overruling the Motion for New Trial and awarding an insufficient amount of damages to" HCS, (2) "overruling the Motion for New Trial and ruling that . . . Cactus . . . was properly dismissed from the action," and (3) "overruling [HCS'] Motion for attorney's fees."

- 715 -

Nebraska Supreme Court Advance Sheets
298 Nebraska Reports
HAND CUT STEAKS ACQUISITIONS v. LONE STAR STEAKHOUSE
Cite as 298 Neb. 705

Lone Star claims that the district court erred by (1) "failing to find that [HCS] accepted Lone Star's surrender of its tenancy, thereby terminating the lease"; (2) "failing to find that [HCS] failed to mitigate damages, thereby excusing Lone Star's obligations under the lease"; (3) "finding that Lone Star breached the lease"; (4) "awarding damages to [HCS]"; and (5) "failing to enter judgment in favor of Lone Star."

## IV. STANDARD OF REVIEW

[1] In a case in which the facts are stipulated, an appellate court reviews the case as if trying it originally in order to determine whether the facts warranted the judgment.[1]

[2] When a jurisdictional question does not involve a factual dispute, determination of a jurisdictional issue is a matter of law which requires an appellate court to reach a conclusion independent from the trial court's.[2]

## V. ANALYSIS

### 1. Surrender and Termination of Lease

Lone Star argues that HCS accepted its surrender of the lease, thereby terminating the lease, by retaking the property for HCS' own benefit and selling the property. Lone Star claims that the district court's finding to the contrary was erroneous. HCS claims that it retook possession of the property in order to relet the property on Lone Star's account in order to mitigate its damages. We agree with the district court that when Lone Star surrendered the property, HCS did not accept Lone Star's offer to terminate the lease.

[3-5] We have held that "'[a]n abandonment of leased premises by the tenant constitutes an offer to terminate the lease . . .'" and that "'whether there has been an acceptance

---

[1] *Klein v. Oakland/Red Oak Holdings*, 294 Neb. 535, 883 N.W.2d 699 (2016).

[2] *Quality Pork Internat. v. Rupari Food Servs.*, 267 Neb. 474, 675 N.W.2d 642 (2004).

- 716 -

Nebraska Supreme Court Advance Sheets
298 Nebraska Reports
HAND CUT STEAKS ACQUISITIONS v. LONE STAR STEAKHOUSE
Cite as 298 Neb. 705

by the landlord of the tenant's abandonment of the premises is largely a matter of intention, and such an acceptance may be inferred from acts of the landlord inconsistent with the continuance of the lease.'"[3] And "[w]hether a surrender and acceptance occurred is a question of fact . . . ."[4]

The relevant evidence of HCS' intent is its conduct after Lone Star surrendered the premises. To a lesser extent, HCS' conduct before Lone Star's surrender may also be relevant to show its intent. The act of retaking possession is itself equivocal as to a lessor's intent.[5] Such conduct could show an intent to accept the tenant's abandonment, or could show an intent to relet the property on the tenant's account in order to mitigate damages.[6]

[6-8] None of HCS' actions were inconsistent with retaking the property for the purpose of reletting it on Lone Star's account in order to mitigate its damages. Lone Star argues that "[t]he act of selling, or attempting to sell, the leased premises is an act wholly and entirely inconsistent with continuation of the lease"[7] and thus shows that HCS accepted Lone Star's surrender. But as we discuss below, a landlord may mitigate its damages not only by reletting the property to another tenant, but also by selling the property. Thus, like retaking and reletting the premises, the act of attempting to sell and selling the property is equivocal. A sale can evince an intent to mitigate the landlord's damages just as easily as it can evince an intent to accept the tenant's surrender. Our review of the record shows no actions by HCS that are inconsistent with an intent

---

[3] *Waite Lumber Co., Inc. v. Masid Bros., Inc.*, 189 Neb. 10, 21, 200 N.W.2d 119, 126 (1972); 50 C.J.S. *Landlord & Tenant* §§ 213 and 218 (2006).

[4] *Signal Management Corp. v. Lamb*, 541 N.W.2d 449, 451 (N.D. 1995).

[5] *Id.*; *First Wisconsin Trust Co. v. L. Wiemann Co.*, 93 Wis. 2d 258, 286 N.W.2d 360 (1980).

[6] See, *Signal Management Corp. v. Lamb, supra* note 4; *First Wisconsin Trust Co. v. L. Wiemann Co., supra* note 5.

[7] Brief for appellee Lone Star on cross-appeal at 17.

- 717 -

Nebraska Supreme Court Advance Sheets
298 Nebraska Reports
HAND CUT STEAKS ACQUISITIONS v. LONE STAR STEAKHOUSE
Cite as 298 Neb. 705

to mitigate its damages by retaking and reletting or selling the property. Where a landlord's actions are not inconsistent with an intent to mitigate its damages, we will not presume that the landlord intended to accept the tenant's surrender and terminate the lease.[8]

Moreover, in divining HCS' intent with regard to the surrender of the lease, we can look to its own words. HCS expressly stated that it was not terminating the lease when it demanded that Lone Star surrender the property. In the notice to quit, HCS wrote that its notice "shall in no way be construed as a termination of [the] Lease or as a relinquishment or waiver by [HCS] as to any rental amounts or other amounts due under [the] Lease for the remainder of the term, or until [HCS] is able to obtain a satisfactory tenant . . . ." HCS' own words were unequivocal that its demand for the surrender of the property was not a termination of the lease.

Because HCS' actions were not inconsistent with an intent to retake the property for the purpose of mitigating its damages after Lone Star's breach by reletting or selling the property, and because HCS expressly stated that it did not intend to terminate the lease, we conclude that HCS did not accept Lone Star's offer to terminate the lease through its abandonment of the property. We affirm the district court's conclusion on this issue.

### 2. Mitigation of Damages

HCS argues that the district court erred in awarding it damages only through the date that HCS and the buyer executed the LOI for the sale of the property. HCS argues that this is inconsistent with the court's conclusion that it acted reasonably to mitigate its damages. Lone Star argues that HCS failed to make reasonable efforts to relet the property in order to mitigate its damages when it rejected bona fide offers to lease the property and instead sought to sell the property—which took a considerable time to consummate.

---

[8] See *Signal Management Corp. v. Lamb, supra* note 4.

- 718 -

Nebraska Supreme Court Advance Sheets
298 Nebraska Reports
HAND CUT STEAKS ACQUISITIONS v. LONE STAR STEAKHOUSE
Cite as 298 Neb. 705

[9-11] This court has held that "a landlord may not unreasonably refuse to accept a qualified and suitable substitute tenant for the purpose of mitigating the damages recoverable from a tenant who has abandoned the leased premises prior to the expiration of the term."[9] We have also explained:

A landlord has a duty to relet the premises in order to mitigate damages when a tenant abandons the premises prior to the expiration of a lease. . . . This duty to mitigate requires that the landlord take all reasonable steps to reduce his damages. . . . In a landlord's action to recover unpaid rent upon a tenant's abandonment of the premises prior to the end of the lease term, the tenant has the burden to show that the landlord unreasonably failed to relet the premises and mitigate damages.[10]

This case presents a related question: If a landlord must make reasonable efforts to mitigate damages after a tenant's abandonment by seeking to relet the leased premises, may the landlord instead seek to mitigate by selling the property? While we suggested that selling is a viable option for mitigation in our opinion in *Properties Inv. Group v. JBA, Inc.*,[11] wherein we approved of a landlord's mitigation efforts and said that "[the landlord's] evidence shows that all of the steps it took *to sell* or lease the property were reasonable," we have yet to explicitly decide the question.

[12,13] Courts in other jurisdictions have concluded that a landlord may mitigate after a tenant abandons by selling the

---

[9] *Bernstein v. Seglin*, 184 Neb. 673, 677, 171 N.W.2d 247, 250 (1969).

[10] *Hilliard v. Robertson*, 253 Neb. 232, 237, 570 N.W.2d 180, 183 (1997). See, also, *Bachman v. Easy Parking of America*, 252 Neb. 325, 562 N.W.2d 369 (1997); *Middagh v. Stanal Sound Ltd.*, 234 Neb. 576, 452 N.W.2d 260 (1990), *supplemented* 235 Neb. 433, 455 N.W.2d 762; *S.N. Mart, Ltd. v. Maurices Inc.*, 234 Neb. 343, 451 N.W.2d 259 (1990).

[11] *Properties Inv. Group v. JBA, Inc.*, 242 Neb. 439, 446, 495 N.W.2d 624, 629 (1993) (emphasis supplied).

- 719 -

Nebraska Supreme Court Advance Sheets
298 Nebraska Reports
HAND CUT STEAKS ACQUISITIONS v. LONE STAR STEAKHOUSE
Cite as 298 Neb. 705

property.[12] The theory behind allowing a sale to mitigate the damages in a breach of a lease by an abandoning tenant is that "the sale price approximate[s] the value of the future rentals."[13] We agree with these authorities and hold that after a tenant has abandoned the leased premises, a landlord may satisfy its duty to mitigate damages by retaking the premises and making reasonable efforts to relet the premises on the tenant's account, to sell the property, or both. And a landlord may generally recover unpaid rent and expenses due under the lease from the time of the tenant's breach through the time the sale of the property is completed, plus any commercially reasonable expenses incurred in order to procure a new tenant or buyer.[14]

[14,15] But a landlord's efforts must be commercially reasonable under the circumstances.[15] In order to determine whether HCS' efforts to lease or sell the property were reasonable, we will look at its conduct beginning at the time its duty to mitigate arose, when Lone Star surrendered the property to HCS.[16]

[16] We need not, and do not, address the adequacy of HCS' efforts to find a new tenant between the time Lone Star informed HCS that it would be ceasing operation of its restaurant in October 2012 and the time HCS retook possession of the property in May 2013. Lone Star continued to pay rent

[12] See, e.g., *Krasne v. Tedeschi and Grasso*, 436 Mass. 103, 762 N.E.2d 841 (2002); *McGuire v. City of Jersey City*, 125 N.J. 310, 593 A.2d 309 (1991).

[13] *McGuire v. City of Jersey City, supra* note 12, 125 N.J. at 320, 593 A.2d at 314.

[14] *Middagh v. Stanal Sound Ltd., supra* note 10; *Noble v. Kerr*, 123 Ga. App. 319, 180 S.E.2d 601 (1971), *disapproved on other grounds, Continental Cas. Co. v. Union Camp Corp.*, 230 Ga. 8, 195 S.E.2d 417 (1973). See, also, *Lu v. Grewal*, 130 Cal. App. 4th 841, 30 Cal. Rptr. 3d 623 (2005).

[15] *Tech Center 2000, LLC v. Zrii, LLC*, 363 P.3d 566 (Utah App. 2015); *Geller v. Kinney*, 980 N.E.2d 390 (Ind. App. 2012).

[16] *Miller v. Burnett*, 54 Kan. App. 2d 228, 397 P.3d 448 (2017). See, also, *Hilliard v. Robertson, supra* note 10.

- 720 -

Nebraska Supreme Court Advance Sheets
298 Nebraska Reports
HAND CUT STEAKS ACQUISITIONS v. LONE STAR STEAKHOUSE
Cite as 298 Neb. 705

until March 2013 and remained in possession of the property until May. Until there was an abandonment or tender of the property by Lone Star, HCS had no duty to mitigate its damages by reletting or selling the property.[17]

HCS and Lone Star executed an acknowledgment of tender and receipt, a formal acknowledgment of Lone Star's surrender of the property to HCS, on May 2, 2013. Through the month of May, HCS was engaged in active negotiations with the ultimate buyer to lease or sell the property. They negotiated and executed an LOI by mid-June. We conclude that HCS' initial efforts to mitigate its damages by leasing or selling the property, through the date of the LOI, were reasonable.

But it took another 10 months from that time until the sale was completed in April 2014. The rent that accumulated during this 10-month period is approximately $90,000, not to mention other expenses. HCS argues that these delays were not its fault, claiming that "[a]ny delays were the result of [the buyer], which is notorious for delays in transactions such as these."[18] But choosing to sell the property to a buyer that in HCS' own words was "notorious" for delays, to the exclusion of pursuing other bona fide offers to lease the property, was not a commercially reasonable way to mitigate damages. Instead, these delays were attributable to HCS' choice to pursue a deal with that buyer. And HCS chose this lengthy path with the knowledge that it had bona fide offers to lease the property from other suitors.

Under our de novo standard of review of this bench trial on stipulated facts,[19] we conclude that HCS' initial efforts to lease or sell the property were reasonable, but that the delay after the execution of the LOI was not reasonable. This conclusion is driven by the specific facts presented.

---

[17] See *Miller v. Burnett, supra* note 16. See, also, *Hilliard v. Robertson, supra* note 10.

[18] Brief for appellant at 19.

[19] *Klein v. Oakland/Red Oak Holdings, supra* note 1.

- 721 -

Nebraska Supreme Court Advance Sheets
298 Nebraska Reports
HAND CUT STEAKS ACQUISITIONS v. LONE STAR STEAKHOUSE
Cite as 298 Neb. 705

[17] To be clear, we are not establishing a legal rule that where a landlord mitigates its damages after a tenant's abandonment by selling the property, damages stop accruing at the time the landlord executes an LOI for the sale of the property. If the landlord's efforts to mitigate are reasonable under all the circumstances—including reasonable in time—damages will ordinarily run until the date of sale.[20] Our conclusion is simply that on the facts of this case, HCS' efforts to mitigate were reasonable only up to a certain point. Thus, we affirm the district court's award of damages for unpaid rent.

We also affirm the district court's award of damages based on amounts due under the lease for common area maintenance, utilities, repairs and maintenance, taxes, and insurance. The calculation of these damages turns on the date at which the damages under the lease stopped accruing. Because we affirm the district court's conclusion that damages ran through June 13, 2013, the date of the LOI for sale to the ultimate buyer, we affirm the district court's calculation of these expenses as well.

We also affirm the district court's denial of damages for HCS' "[l]andlord [c]ontribution" under the lease of 6 months' free rent at the beginning of the term. Providing this free rent at the beginning of the term was part of the bargained-for exchange that HCS agreed to under the lease. As the district court pointed out, nothing in the lease provides that Lone Star must repay the value of this free rent in the event it breached the lease. To allow HCS to recover damages for the value of this free rent in addition to damages for the rent due under the lease would be to allow a double recovery, putting it in a better position than it would have been had Lone Star not breached the contract. We affirm the district court's award of damages.

---

[20] *McGuire v. City of Jersey City, supra* note 12; *Noble v. Kerr, supra* note 14.

- 722 -

Nebraska Supreme Court Advance Sheets
298 Nebraska Reports
HAND CUT STEAKS ACQUISITIONS v. LONE STAR STEAKHOUSE
Cite as 298 Neb. 705

### 3. Personal Jurisdiction

HCS claims the district court erred in concluding that the court lacked personal jurisdiction over Cactus and consequently dismissing its claim against Cactus.

In the guaranty, Cactus "absolutely and unconditionally guarantee[d] the payment and performance of, and agree[d] to pay and perform as primary obligor, all liabilities, obligations, and duties (including but not limited to payment of rent) imposed upon [Lone Star] under the terms of the . . . Lease." The guaranty stated that it was made by Cactus "in consideration of the direct and material benefits that will accrue to [Cactus], and for the purpose of inducing [HCS] to enter into" the lease with Lone Star.

The lease itself acknowledged the guaranty, providing that "[a]s an inducement to [HCS] to enter into this Lease, [Lone Star] agrees and acknowledges that its obligations under this Lease shall be guaranteed . . ." by Cactus. The lease provided that it "shall be construed, interpreted, and enforced pursuant to the applicable laws of the state in which the Premises are located," i.e., Nebraska law. Cactus was also a subsidiary of Lone Star's parent company. And Cactus was a named insured in a certificate of liability insurance covering the property and operation of the Lone Star restaurant.

HCS argues that these contacts by Cactus with Nebraska are sufficient for the exercise of personal jurisdiction over Cactus in Nebraska and that the district court erred in dismissing its claim against Cactus. We agree.

### (a) Minimum Contacts Analysis

[18,19] Personal jurisdiction is the power of a tribunal to subject and bind a particular person or entity to its decisions.[21] Courts' ability to validly exercise personal jurisdiction is not without limit. The Due Process Clause of the 14th Amendment

---

[21] *Quality Pork Internat. v. Rupari Food Servs., supra* note 2. See, generally, Larry L. Teply & Ralph U. Whitten, *Civil Procedure*, ch. 3 (5th ed. 2013) (discussing personal jurisdiction generally).

to the U.S. Constitution bars a court from exercising personal jurisdiction over an out-of-state defendant, served with process outside the state,[22] unless that defendant has sufficient ties to the forum state.[23]

[20] A two-step analysis is used to determine whether a Nebraska court may validly exercise personal jurisdiction over an out-of-state defendant.[24] First, a court must consider whether Nebraska's long-arm statute[25] authorizes the exercise of personal jurisdiction over the defendant.[26] Second, a court must consider whether the exercise of personal jurisdiction over the defendant comports with due process.[27]

[21] Nebraska's long-arm statute authorizes courts to exercise personal jurisdiction over any person "[w]ho has any . . . contact with or maintains any . . . relation to this state to afford a basis for the exercise of personal jurisdiction consistent with the Constitution of the United States."[28] Thus, if a Nebraska court's exercise of personal jurisdiction would comport with the Due Process Clause of the 14th Amendment, it is authorized by the long-arm statute.[29] Although in its brief HCS also asserted authorization under § 25-536(1)(f), at oral argument, it abandoned that argument.

[22-24] To satisfy the Due Process Clause, a court may only exercise personal jurisdiction over a defendant that is not present in the forum state if that defendant has "minimum contacts" with the forum such that the exercise of jurisdiction

---

[22] See *Burnham v. Superior Court of Cal., Marin County*, 495 U.S. 604, 110 S. Ct. 2105, 109 L. Ed. 2d 631 (1990) (instate service of process).

[23] See *Internat. Shoe Co. v. Washington*, 326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95 (1945).

[24] See *Quality Pork Internat. v. Rupari Food Servs., supra* note 2.

[25] Neb. Rev. Stat. § 25-536 (Reissue 2016).

[26] *Quality Pork Internat. v. Rupari Food Servs., supra* note 2.

[27] *Id.*

[28] § 25-536(2).

[29] See, *id.*; *Quality Pork Internat. v. Rupari Food Servs., supra* note 2.

- 724 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
298 NEBRASKA REPORTS
HAND CUT STEAKS ACQUISITIONS v. LONE STAR STEAKHOUSE
Cite as 298 Neb. 705

"does not offend 'traditional notions of fair play and sub-
stantial justice.'"[30] To constitute sufficient minimum contacts,
"the defendant's conduct and connection with the forum State
[must be] such that he [or she] should reasonably anticipate
being haled into court there."[31] Whether a defendant's contacts
with the forum state are sufficient to support the exercise of
personal jurisdiction "will vary with the quality and nature
of the defendant's activity, but it is essential in each case that
there be some act by which the defendant purposefully avails
itself of the privilege of conducting activities within the forum
State, thus invoking the benefits and protections of its laws."[32]
Thus, "[j]urisdiction is proper . . . where the [defendant's] con-
tacts proximately result from actions by the defendant [him-
self or herself] that create a 'substantial connection' with the
forum State."[33]

Two primary purposes are served by the requirement of
minimum contacts with the forum.[34] First, "[i]t protects the
defendant against the burdens of litigating in a distant or
inconvenient forum."[35] The burden on the defendant is always
of "primary concern."[36] And second, the minimum contacts
inquiry "acts to ensure that the States, through their courts, do
not reach out beyond the limits imposed on them by their status
as coequal sovereigns in a federal system."[37]

---

[30] *Internat. Shoe Co. v. Washington, supra* note 23, 326 U.S. at 316.

[31] *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S. Ct.
559, 62 L. Ed. 2d 490 (1980).

[32] *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 2 L. Ed. 2d 1283
(1958).

[33] *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S. Ct. 2174, 85
L. Ed. 2d 528 (1985). See, also, *Walden v. Fiore*, ___ U.S. ___, 134 S. Ct.
1115, 188 L. Ed. 2d 12 (2014).

[34] See *World-Wide Volkswagen Corp. v. Woodson, supra* note 31.

[35] *Id.*, 444 U.S. at 292.

[36] *Id.*

[37] *Id.* See, also, *Bristol-Myers Squibb v. Superior Ct. of CA*, ___ U.S. ___,
137 S. Ct. 1773, 198 L. Ed. 2d 395 (2017).

- 725 -

Nebraska Supreme Court Advance Sheets
298 Nebraska Reports
HAND CUT STEAKS ACQUISITIONS v. LONE STAR STEAKHOUSE
Cite as 298 Neb. 705

[25] In the minimum contacts analysis, courts will consider the burden on a defendant in light of other considerations, such as (1) "the forum State's interest in adjudicating the dispute," (2) "the plaintiff's interest in obtaining convenient and effective relief," (3) "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and (4) "the shared interest of the several States in furthering fundamental substantive social policies."[38] Consideration of these factors may "sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required."[39]

[26] The nature and quality of a defendant's contacts with the forum state necessary to support the exercise of personal jurisdiction depend on the connection between the contacts and the claim being asserted.[40] The U.S. Supreme Court has identified two categories of personal jurisdiction, "general jurisdiction" and "personal jurisdiction."[41]

[27,28] General, or all-purpose, jurisdiction is jurisdiction arising where a defendant's "'affiliations with the State are so "continuous and systematic" as to render [the defendant] essentially at home in the forum State.'"[42] Where a court has general personal jurisdiction over a defendant, it can adjudicate any claim against the defendant—even a claim that arises

---

[38] *World-Wide Volkswagen Corp. v. Woodson, supra* note 31, 444 U.S. at 292.

[39] *Burger King Corp. v. Rudzewicz, supra* note 33, 471 U.S. at 477.

[40] See, generally, Arthur T. von Mehren & Donald T. Trautman*, Jurisdiction to Adjudicate: A Suggested Analysis*, 79 Harv. L. Rev. 1121 (1966) (general and specific jurisdiction).

[41] See *Bristol-Myers Squibb v. Superior Ct. of CA, supra* note 37, 137 S. Ct. at 1780.

[42] *Id.*, 137 S. Ct. at 1785 (Sotomayor, J., dissenting). See, also, *Goodyear Dunlop Tires Operations, S. A. v. Brown*, 564 U.S. 915, 131 S. Ct. 2846, 180 L. Ed. 2d 796 (2011); *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984); *Quality Pork Internat. v. Rupari Food Servs., supra* note 2.

- 726 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
298 NEBRASKA REPORTS
HAND CUT STEAKS ACQUISITIONS v. LONE STAR STEAKHOUSE
Cite as 298 Neb. 705

outside the forum state and bears no connection to the defendant's contacts with the forum.[43]

[29-31] By contrast, specific, or case-linked, jurisdiction requires that a claim "'aris[e] out of or relat[e] to the defendant's contacts with the *forum*.'"[44] A defendant need not be "'at home'" in the forum to be subject to specific personal jurisdiction, but, rather, there "must be 'an affiliation between the forum and the underlying controversy . . . .'"[45] "'[S]pecific [personal] jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction.'"[46] Thus, "there must be a substantial connection between [the defendant's] contacts and the operative facts of the litigation."[47]

Cactus, a Delaware limited liability company doing business in Texas, clearly did not have "'"continuous and systematic"'" contacts with Nebraska; nor was it "'essentially at home'" in Nebraska.[48] Rather, HCS asserts that the district court had specific personal jurisdiction over Cactus. Thus, the relevant ties between Cactus and Nebraska are those that bear some relation to this case. Cactus' unrelated contacts with Nebraska, or lack thereof, have no bearing on our specific personal jurisdiction analysis.

---

[43] See *Bristol-Myers Squibb v. Superior Ct. of CA, supra* note 37.

[44] *Id.*, 137 S. Ct. at 1780 (emphasis in original). See, also, *Daimler AG v. Bauman*, ___ U.S. ___, 134 S. Ct. 746, 187 L. Ed. 2d 624 (2014); *Quality Pork Internat. v. Rupari Food Servs., supra* note 2.

[45] *Bristol-Myers Squibb v. Superior Ct. of CA, supra* note 37, 137 S. Ct. at 1780. See, also, *Goodyear Dunlop Tires Operations, S. A. v. Brown, supra* note 42.

[46] *Bristol-Myers Squibb v. Superior Ct. of CA, supra* note 37, 137 S. Ct. at 1780 (quoting *Goodyear Dunlop Tires Operations, S. A. v. Brown, supra* note 42).

[47] *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 585 (Tex. 2007).

[48] See *Bristol-Myers Squibb v. Superior Ct. of CA, supra* note 37, 137 S. Ct. at 1785 (Sotomayor, J., dissenting).

- 727 -

Nebraska Supreme Court Advance Sheets
298 Nebraska Reports
HAND CUT STEAKS ACQUISITIONS v. LONE STAR STEAKHOUSE
Cite as 298 Neb. 705

Two U.S. Supreme Court cases provide guidance for analyzing minimum contacts for specific personal jurisdiction in cases involving contract claims. In *McGee v. International Life Ins. Co.*,[49] the Court concluded that a California court could exercise personal jurisdiction over a Texas life insurance company for a claim arising from a life insurance contract issued to a California resident. A California resident purchased a life insurance policy from an Arizona insurer.[50] Several years later, a Texas insurer assumed all of the Arizona company's life insurance obligations.[51] The Texas insurer sent a reinsurance certificate to the California resident, offering to insure him under the same terms as his prior policy, which he accepted.[52] The California resident continued to pay his insurance premiums by mail to the insurer's office in Texas.[53] The Texas insurer did no other business in California and had no agents or offices in California.[54] When the California resident died, the Texas insurer refused to pay the beneficiary under the policy.[55] The beneficiary sued the Texas insurer in California state court.[56] The insurer contended the California court lacked personal jurisdiction over it.[57]

[32] In spite of the Texas insurer's lack of other connections to California, the Court concluded that "[i]t is sufficient for purposes of due process that the suit was based on a

---

[49] *McGee v. International Life Ins. Co.*, 355 U.S. 220, 78 S. Ct. 199, 2 L. Ed. 2d 223 (1957).

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] *Id.*

- 728 -

Nebraska Supreme Court Advance Sheets
298 Nebraska Reports
HAND CUT STEAKS ACQUISITIONS v. LONE STAR STEAKHOUSE
Cite as 298 Neb. 705

contract which had substantial connection with that State."[58] The Court reasoned:

> The contract was delivered in California, the premiums were mailed from there and the insured was a resident of that State when he died. It cannot be denied that California has a manifest interest in providing effective means of redress for its residents when their insurers refuse to pay claims.[59]

The Court concluded that the California court's exercise of personal jurisdiction did not violate the Due Process Clause.[60]

[33] In *Burger King Corp. v. Rudzewicz*,[61] the Court concluded that a Florida court could validly exercise personal jurisdiction over a Michigan defendant.[62] The defendant operated a restaurant franchise in Michigan.[63] The franchising corporation, which maintained its headquarters in Florida, sued the Michigan franchisee for breach of the franchise agreement in Florida court.[64] The franchisee argued that the Florida court could not validly exercise personal jurisdiction over him; after all, he maintained no offices in Florida and had never even visited Florida.[65] But the Court rejected this argument, reasoning that "this franchise dispute grew directly out of 'a contract which had a *substantial* connection with that State.'"[66] The Court said that personal jurisdiction "may not be avoided merely because the defendant did not *physically* enter the forum State."[67] By seeking and obtaining a franchise

---

[58] *Id.*, 355 U.S. at 223.

[59] *Id.*

[60] *McGee v. International Life Ins. Co., supra* note 49.

[61] *Burger King Corp. v. Rudzewicz, supra* note 33.

[62] *Id.*

[63] *Id.*

[64] *Id.*

[65] *Id.*

[66] *Id.*, 471 U.S. at 479 (emphasis in original).

[67] *Id.*, 471 U.S. at 476 (emphasis in original).

- 729 -

Nebraska Supreme Court Advance Sheets
298 Nebraska Reports
HAND CUT STEAKS ACQUISITIONS v. LONE STAR STEAKHOUSE
Cite as 298 Neb. 705

agreement with the corporation, the Court said, the defendant "deliberately 'reach[ed] out beyond' Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise and the manifold benefits that would derive from affiliation with a nationwide organization."[68] Thus, the Court concluded that the exercise of personal jurisdiction by a Florida court did not violate the Due Process Clause.[69]

### (b) Cactus' Contacts With Nebraska

Several reasons support our conclusion that Cactus "'reach[ed] out'"[70] to Nebraska and "purposefully avail[ed] itself of the privilege of conducting activities within"[71] Nebraska, "thus invoking the benefits and protections of its laws,"[72] such that it "should reasonably anticipate being haled into court"[73] in Nebraska in connection with claims arising from the lease and guaranty.

First, as both the guaranty and lease expressly acknowledged, the purpose of Cactus' guaranty was to induce HCS to enter into the agreement with Lone Star, a Nebraska corporation, to lease the Nebraska property for the operation of a business in Nebraska. Unlike a contract that merely has incidental effects in a particular state, Cactus executed this guaranty for the express purpose of inducing the lease of Nebraska property to a Nebraska business.

In *Quality Pork Internat. v. Rupari Food Servs.*,[74] we concluded that the defendant had sufficient minimum contacts with Nebraska to justify the exercise of personal jurisdiction.

---

[68] *Id.*, 471 U.S. at 479-80.

[69] *Burger King Corp. v. Rudzewicz, supra* note 33.

[70] See *id.*, 471 U.S. at 479.

[71] See *Hanson v. Denckla, supra* note 32, 357 U.S. at 253.

[72] See *id*.

[73] See *World-Wide Volkswagen Corp. v. Woodson, supra* note 31, 444 U.S. at 297.

[74] *Quality Pork Internat. v. Rupari Food Servs., supra* note 2.

- 730 -

Nebraska Supreme Court Advance Sheets
298 Nebraska Reports
HAND CUT STEAKS ACQUISITIONS v. LONE STAR STEAKHOUSE
Cite as 298 Neb. 705

Under the oral contract at issue in that case, the defendant, a Florida food business, arranged for the plaintiff, a Nebraska producer of pork products, to ship products to a Texas food distributor.[75] The Nebraska plaintiff had previously done business with the Texas food distributor, but stopped selling to it after its account became delinquent.[76] The Nebraska plaintiff agreed to ship products to the Texas food distributor because of the Florida defendant's agreement to pay for the orders.[77] After paying for the first two orders, the defendant failed to pay for the third.[78] The Nebraska plaintiff sued in Nebraska court, and the Florida defendant objected to the court's exercise of personal jurisdiction over it.[79]

[34] We concluded that the Florida defendant had sufficient minimum contacts with Nebraska.[80] We said that "[t]o determine whether a defendant's contract supplies the contacts necessary for personal jurisdiction in a forum state, a court is to consider the parties' prior negotiations and future contemplated consequences, along with the terms of the contract and the parties' actual course of dealing."[81] We noted that "[the Florida defendant] induced [the Nebraska plaintiff] to ship products to [the Texas distributor]" with which it had previously ceased doing business.[82] We reasoned that "[b]y purposefully conducting business with [the Nebraska plaintiff], [the Florida defendant] could reasonably anticipate that it might be sued in Nebraska if it failed to pay for products ordered from [the Nebraska plaintiff]."[83] We said

---

[75] *Id.*

[76] *Id.*

[77] *Id.*

[78] *Id.*

[79] *Id.*

[80] *Id.*

[81] *Id.* at 484, 675 N.W.2d at 651.

[82] *Id.*

[83] *Id.* at 485, 675 N.W.2d at 652.

- 731 -

Nebraska Supreme Court Advance Sheets
298 Nebraska Reports
HAND CUT STEAKS ACQUISITIONS v. LONE STAR STEAKHOUSE
Cite as 298 Neb. 705

that "[w]here a defendant who has purposefully directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other consideration would render jurisdiction unreasonable," and we found no such compelling case.[84]

Cactus' guaranty presents an inducement similar, though not identical, to that in *Quality Pork Internat.*[85] While in *Quality Pork Internat.*, the out-of-state defendant induced a Nebraska business to do business with an out-of-state third party, here Cactus induced an out-of-state business to lease Nebraska property to a Nebraska business. But both here and in *Quality Pork Internat.*, the defendant purposefully reached out to induce a particular action within the forum state. When making such an inducement, Cactus should have reasonably anticipated being haled into Nebraska courts in the event that the Nebraska lessee of the Nebraska property failed to perform its obligations under the lease, the performance of which Cactus guaranteed.

[35] Second, Nebraska has a significant interest in having the dispute over this guaranty of the lease of Nebraska property adjudicated in Nebraska courts. Unlike a situation in which out-of-state parties agree for one party to guarantee the personal debt of a third party who happens to be a Nebraska resident, Nebraska has a unique interest in adjudicating transactions affecting Nebraska land. And a "'forum State's interest in adjudicating the dispute,'" among other considerations, may "sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required."[86]

Importantly, Cactus did not merely guarantee the payment of rent due under the lease, but "agree[d] to pay and perform as primary obligor, all liabilities, obligations, and duties

---

[84] *Id.*

[85] See *Quality Pork Internat. v. Rupari Food Servs., supra* note 2.

[86] *Burger King Corp. v. Rudzewicz, supra* note 33, 471 U.S. at 477.

- 732 -

Nebraska Supreme Court Advance Sheets
298 Nebraska Reports
HAND CUT STEAKS ACQUISITIONS v. LONE STAR STEAKHOUSE
Cite as 298 Neb. 705

(including but not limited to payment of rent) imposed upon" Lone Star under the lease. Those additional duties—which Cactus agreed to perform "as primary obligor"—included payment of utility services and real estate taxes; maintaining property, liability, and workers' compensation insurance; and maintaining and repairing the entire premises, including landscaping, sidewalks, and parking area, in a "first class manner and condition."

[36,37] While a guaranty of a personal debt generally bears no intrinsic connection to any particular location, a guaranty to pay and perform a tenant's obligations under a lease of real property uniquely affects the state in which the premises are located.[87] Real property, of course, is always and inevitably within the territorial borders of the state in which it lies. While the Due Process Clause's personal jurisdiction analysis no longer bears a "rigidly territorial focus,"[88] states nevertheless, as "coequal sovereigns in a federal system,"[89] have a special interest in adjudicating disputes relating to the real property within their borders.[90]

[38] Where a guarantor takes on obligations that are uniquely tied to and uniquely affect a particular location, it is not unreasonable for courts of that state to exercise personal jurisdiction over the guarantor in connection with claims arising from or related to those obligations.[91] Cactus guaranteed the performance of Lone Star's contractual obligations to pay rent for the lease of Nebraska property, to pay Nebraska property taxes, to maintain in good repair the Nebraska property, and

---

[87] See, generally, *Shaffer v. Heitner*, 433 U.S. 186, 97 S. Ct. 2569, 53 L. Ed. 2d 683 (1977).

[88] *Daimler AG v. Bauman, supra* note 44, 134 S. Ct. at 755.

[89] *World-Wide Volkswagen Corp. v. Woodson, supra* note 31, 444 U.S. at 292. See, also, *Bristol-Myers Squibb v. Superior Ct. of CA, supra* note 37.

[90] See, generally, *Shaffer v. Heitner, supra* note 87.

[91] See, generally, *Burger King Corp. v. Rudzewicz, supra* note 33; *McGee v. International Life Ins. Co., supra* note 49.

- 733 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
298 NEBRASKA REPORTS
HAND CUT STEAKS ACQUISITIONS v. LONE STAR STEAKHOUSE
Cite as 298 Neb. 705

to maintain property and liability insurance for the Nebraska property and Lone Star's Nebraska business. The guaranty of these obligations was such that Cactus "should reasonably anticipate being haled into court"[92] in Nebraska in the event of litigation over the guaranty and lease.

[39] Third, Cactus guaranteed the performance of Lone Star's obligations under the lease, which obligations were governed by Nebraska law pursuant to the lease's choice-of-law provision. Cactus "agree[d] to pay and perform as primary obligor, all liabilities, obligations, and duties" of the tenant under a lease governed by Nebraska law. While the minimum contacts personal jurisdiction analysis is distinct from a choice-of-law analysis, a choice-of-law contractual provision in favor of the forum state's law is a relevant contact with the forum.[93]

In *Burger King Corp.*, the Court relied on the franchise agreement's choice-of-law provision to conclude that jurisdiction was proper, stating that the provision "reinforced [the defendant's] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there."[94] The Court further said that the choice-of-law provision showed that the defendant "'purposefully availed himself of the benefits and protections of Florida's laws' by entering into contracts expressly providing that those laws would govern franchise disputes."[95]

By "absolutely and unconditionally guarantee[ing] the payment and performance of, and agree[ing] to pay and perform as primary obligor, all liabilities, obligations, and duties . . . imposed upon [Lone Star] under the terms of the . . . Lease," which duties and obligations were governed by Nebraska law, Cactus "purposefully avail[ed] itself of the privilege of

---

[92] *World-Wide Volkswagen Corp. v. Woodson, supra* note 31, 444 U.S. at 297.

[93] *Burger King Corp. v. Rudzewicz, supra* note 33.

[94] *Id.*, 471 U.S. at 482.

[95] *Id.*

- 734 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
298 NEBRASKA REPORTS
HAND CUT STEAKS ACQUISITIONS v. LONE STAR STEAKHOUSE
Cite as 298 Neb. 705

conducting activities within [Nebraska], thus invoking the benefits and protections of [Nebraska's] laws."[96]

Finally, the fact that Cactus was a named insured on the insurance policy covering the property and the Lone Star business is a relevant, though less significant, contact with Nebraska. But Cactus' relationship with Lone Star as a subsidiary of Lone Star's parent company is not a relevant contact where there has been no attempt to "pierce the corporate veil"[97] and impute Lone Star's Nebraska residency or Nebraska contacts to Cactus.

In sum, because Cactus guaranteed the full performance of a Nebraska business' obligations of a lease of Nebraska property in order to induce HCS to enter into that lease, which was governed by Nebraska law, Cactus has sufficient minimum contacts with Nebraska to justify the exercise of personal jurisdiction over it by Nebraska's courts. We reverse the district court's dismissal of Cactus and remand the cause for further proceedings consistent with this opinion.

### 4. ATTORNEY FEES

The lease between HCS and Lone Star provided for the award of attorney fees to the prevailing party in the event of litigation to enforce the lease. HCS claims that the district court erred in overruling its motion for attorney fees. We disagree.

[40] Since the 1800's, this court has refused to enforce contractual provisions providing for the award of attorney fees for the prevailing party, instead holding to the "American Rule" that each party pay its own costs.[98] And we recently reaffirmed our position that "in the absence of a uniform

---

[96] See *Hanson v. Denckla, supra* note 32, 357 U.S. at 253.

[97] See, generally, *Global Credit Servs. v. AMISUB*, 244 Neb. 681, 686, 508 N.W.2d 836, 842 (1993).

[98] See, *Stewart v. Bennett*, 273 Neb. 17, 727 N.W.2d 424 (2007); *Parkert v. Lindquist*, 269 Neb. 394, 693 N.W.2d 529 (2005); *Security Co. v. Eyer*, 36 Neb. 507, 54 N.W. 838 (1893); *Dow v. Updike*, 11 Neb. 95, 7 N.W. 857 (1881).

- 735 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
298 NEBRASKA REPORTS
HAND CUT STEAKS ACQUISITIONS v. LONE STAR STEAKHOUSE
Cite as 298 Neb. 705

course of procedure or authorization by statute, contractual agreements for attorney fees are against public policy and will not be judicially enforced."[99] We decline to depart from our long-held jurisprudence, and we affirm the district court's overruling of HCS' motion for attorney fees.

### 5. HCS' MOTION FOR NEW TRIAL

HCS' appeal of the overruling of its motion for new trial is premised on the same issues addressed in this opinion. Thus, we need not address it separately.

### VI. CONCLUSION

For the foregoing reasons, we affirm the district court's award of damages to HCS and the court's denial of HCS' requested attorney fees. We reverse the district court's dismissal of Cactus and remand the cause for further proceedings on HCS' claim against Cactus.

AFFIRMED IN PART, AND IN PART REVERSED AND
REMANDED FOR FURTHER PROCEEDINGS.

WRIGHT and MILLER-LERMAN, JJ., not participating.

---

[99] *Stewart v. Bennett, supra* note 98, 273 Neb. at 22, 727 N.W.2d at 429.